Good morning. May it please the Court. Alexandria Katchadourian on behalf of Plaintiff and Appellant Marche Meeks. I'm going to reserve three minutes for rebuttal. Just to give you a brief roadmap of where I'm going, I'd like to briefly touch upon the jurisdictional issue, and then I'd like to move on to the substance of the TCPA issues. First of all, with respect to jurisdiction, this is a very simple issue. I think we've spent a lot of time briefing it, and I think a lot of that is actually unnecessary. Duke Energy could not be more directly on point. It's as close a match as you could hope for, and it really controls here. This is a situation where you have permissively joined joint tort feasors, where there's joint and several liability. They never needed to be sued in the same action to begin with. We could have always sued them in separate actions. We could have had the motion been to dismiss, been denied as to Yelp, immediately dismissed Yelp and sued everybody in a separate action. We could immediately after dismiss— You could have, but you didn't. Huh? You could have, but you did not. We could have, but we did not. For convenience, we did join them all in the same action, and we think there's no purpose for us to be penalized by later realizing that it complicated things rather than streamlined things and ultimately unjoining them. I think Duke Energy makes clear that this is absolutely a plaintiff's right to do that under Rule 41, provided that there is no summary judgment motion or answer to simply unjoin them and to go back to the permissive jointer situation where you don't have to sue all tort feasors in one action, and that's simply what we did here. I think we spent a lot of time discussing issues that relate to claim splitting where you have multiple claims against the same defendant. Yelp was dismissed with prejudice. There were no remaining claims against it. It was simply other defendants who remained in the action who could have all— But the other defendants remaining in the action is a problem because you need a final judgment as to all parties. Well, we believe that the judgment was final as to Yelp. There was a dismissal of prejudice. But that's not enough. That is to say, if you've got three parties, three defendants, you've got a final judgment as to one, and the other two are still in the suit, that's not a final judgment that's appealable, correct? I would disagree that under Duke Energy it is a final judgment that's appealable once you dismiss the other parties and simply unjoin them instead of having them remain in the action, provided that you haven't reached some side agreement to manipulate the proceedings to put them back into that same proceeding and go forward and simply hold it in abeyance. There was no agreement to do that here. We simply went back to what we could have done originally, which is to have separate actions against all parties. And in that sense, we created the final judgment by simply just unjoining the parties as Duke Energy allows us to do. And we think under this Court's precedence in Duke Energy as well as its affirmance in Munns v. Carey, albeit in a footnote, that this was a permissible procedure and that final judgment did result as to Yelp. That is then appealable. And we have no intent to bring the other parties back into this litigation. I wanted to pick up on that very last thing you said, because there are some statements in your opening brief that did suggest that you contemplated some further proceedings against the non-Yelp defendants. And I just want to be clear, I think you just said it, but you do not intend, should we conclude that there is jurisdiction and should there be a favorable ruling, you have abandoned the effort to proceed against them? We have abandoned the effort to proceed against them in this action. Now, we could have always, the next day, we have no intent to proceed against them again. Mr. Meeks does not intend to see those entities again in this proceeding or any other right now. Or any other right now? Right. We don't, I mean, obviously, I mean, he retains the right, but we have no intent to act. We have no intent to actually proceed against these defendants again. We're not going to go down and add them into the action. I mean... You've kind of abandoned the ability to go forward again. Against these defendants, yes. Kind of. Yes. Yes. I mean, theoretically, a plaintiff could proceed against them who is a member of the class or the putative class to the extent the statute of limitations remains in effect against them. But we are saying for this suit, we are not going to, if it's remanded, you know, seek leave to amend to add them back into the action. We have no intent to do that. We're not going to do that. I think that a lot of this got lost in the weeds because of the claim-splitting issue. There are no multiple claims pending against these defendants. A lot of the cases that both parties have dealt with and that we spent a lot of time discussing in the briefs really dealt where you had at least some claims remaining against at least one of the parties in the action, or you had an agreement with other parties to remove them and then put them back in or to remove some claims and put that back in. There's no such agreement here or, you know, sort of a handshake as to what we're going to do. This was completely unilateral on our part. Why did you dismiss them without prejudice? Because members of the putative class retained the right to proceed against them. Theoretically — Has been certified? There has not been a certified class. Okay. So, I mean, a dismissal with prejudice would bind your client, but wouldn't have had any effect on the other members of the class, would it? No, it would not, and that's correct. However, theoretically, and although we have not done this and we're not going to do this, Mr. Meeks did have the right to proceed against his defendants separately in state court, for example, if he wanted to. This case was actually removed from state court. It was a state court action. Theoretically, he could have pursued them in another forum, such as state court. Again, he chose not to do that. He's chosen to abandon his claims against these defendants. But doesn't a dismissal without prejudice sort of lead to advisory opinions? I think to the extent you have a dismissal with prejudice against the party as to whom you're seeking review of an order, and you are no longer proceeding against them, you have no — there is no intent to continue litigation of the action against the defendants dismissed without prejudice. I don't think it does. I think this Court can issue a final — can issue a binding opinion as to Yelp, which is the only order we seek to review. It's only on the order on the motion as to Yelp that we want reviewed. We don't want the transfer order or anything with respect to the other defendants as to them addressed. We just want Yelp's liability to be addressed. And that's all we're asking for. And they are completely out of the action with no pending claims and have been from the beginning. With that, I'd like to, if there's no further questions on jurisdiction, move on to the substantive TCPA issue. There are really two issues on the — under the TCPA. There's maker-initiator liability, and there is vicarious liability. And overarching all of those is the procedural posture in which this case reaches the Court. It was after a motion dismissed without prejudice. There was never even a single opportunity for leave to amend. Every other TCPA case that has been cited by this Court was after a grant of summary judgment where there was an opportunity for discovery and factual development of the record. But did your complaint itself preclude amendment by essentially conceding futility based upon statements in the complaint that Yelp didn't actively sort of do anything? It does not. And I know that's been a point of discussion both in the district court and in the briefing before this Court. And we believe that it's the result of confusion. Paragraphs 28 through 31 of the complaint where we discuss the level of involvement of the Buffalo Wild Wings defendants really concerns franchisor-franchisee liability, the relationship between those entities themselves. We wanted to make clear for the purpose of asserting a nationwide punitive class that it was the sort of central franchisor who controlled the operations of their that it dictated to all the franchisees so that we wouldn't sort of piecemeal be having to litigate against each of the individual franchisees. It was simply meant to describe the relationship between those restaurant defendants themselves and how it operated centrally. It was not intended to define the relationship as between the restaurants and Yelp. Moreover, the District of Nevada's opinion in Bowman v. Saks I think is very instructive in the regard because this really is a business-to-business relationship between Yelp and the restaurant defendants where you have a joint venture and a collaboration. It's not a consumer-facing application and software. You have a business relationship where there is involvement by both parties. They negotiated a platform in which you could send out a text marketing campaign. So it's not a situation where you have sort of an ignorant, passive consumer who's just clicking buttons and operating with respect to other individual consumers. You have a mutually beneficial business relationship between two parties that's going to benefit both of them in the marketing regard. And I think that's substantially different than a lot of the other district court cases  Do you concede, though, that it is the restaurant or somebody associated with the restaurant and not Yelp who makes the decision about to whom a message will be sent and when messages will be sent? No. In fact, that's the central core of our allegations against Yelp is that everything's pre-sent to an automated platform. Imagine this. You have a pre-existing app on your smartphone. Every time you add a new contact to your phone list, it immediately sends a text without you having to do anything. Our supposition is that the software is designed by Yelp that immediately upon entry of a number into that system, it is an automated process which immediately generates a pre-set text message to be sent to a consumer. There isn't a hostess standing there saying, OK, I'm going to send to this individual and I'm going to wait five minutes and then I'm going to send to this person or I'm going to send to fewer than all. Well, the whole point was to stream for the restaurants. It's a predetermined process. The switch is already flipped once you buy the platform. That's your argument. Essentially, yes. It all happens with no human involvement except for the entry of the numbers like adding it to a contact list. The point is to minimize human involvement, to streamline front-of-the-house operations, not create a more complicated process where you have to have a hostess doing more in a crowded restaurant. That is really what we think. It's really the architecture of the software that dictates the timing and the transmission rather than having human involvement. The whole point of the relationship between the parties was that it would generate it automatically. We think that discovery further into the action would show that this was an automated platform. It's very similar to the cases with Twilio, to Bowman, and to the WIC 2017 order where you have an automated platform such as in WIC. As soon as somebody submitted their information online, it sent them a text message to complete the order, or you had a marketing campaign such as in Bowman where you had the Twilio platform and it was sending it out, preset to send out messages to individuals in the contact list. In those cases, Twilio was held to be the maker or initiator under the FCC's 2015 order because of their substantial level of involvement, and that's really the test. It's discernible involvement given the totality of the circumstances. Looking at how involved was Yelp in the technology, in the advising, in the assistance with these text messages, as well as their avoidance of carrier spam filters, which the FCC found was a major factor in finding initiator and maker liability. When we think that Yelp was advising to avoid carrier spam filters, we haven't alleged this in the complaint, but we've discussed this and would do so upon leave to amend, that there were long codes used to help avoid carrier spam filters that did not actually connect to any number. They simply avoided the short code review process that would have required consent to receive unsolicited text messages. Do you want to save some time? Yeah, I do. I've not reached vicarious liability, so let me just say briefly we also believe that there's an issue of ratification. Yelp clearly accepted the benefits. Their links, their information, their platform is being advertised in benefiting these text messages. There's a joint venture between the parties, and they're ratifying and accepting the benefits. We think under this course of precedence, there is vicarious liability on this ground, and I'll reserve the rest. Okay, thank you. May it please the Court, I'm Brian Sutherland for Yelp. I'd like to begin by addressing the jurisdiction point, and then I'll turn to the merits. With respect to jurisdiction, I would say only this, that the price of finality is dismissal with prejudice. So if counsel is willing to represent today that she has dismissed the restaurants with prejudice, then there is finality and the Court has jurisdiction, and I think we can leave it there because I believe she'll make that representation consistent with what she said in her reply brief on page 2 and has said to the Court today. With respect to the merits, what the ---- Let me understand. Are you saying that she can retroactively dismiss them with prejudice, or are you saying that if she had dismissed with prejudice? I'm saying that her representation today would suffice to create finality, and I base that on decisions of the Third Circuit and the Seventh Circuit, which have accepted representations from counsel in the interest of efficiency to create finality for an order. Now, the Court doesn't have to do that. It could dismiss for lack of jurisdiction. That would be fine with us, too, and then we'll come back here and argue the merits later. But I am saying that I will accept her representation, that she's dismissing the other defendants with prejudice, thereby creating finality. I would accept that representation, Your Honor, and I leave it to the Court to mind its own appellate jurisdiction beyond that statement. Unless the Court has questions, I'm happy to address it. So parties get to brief everything and then go to court and then create jurisdiction right now? Well, it does manipulate the Court's jurisdiction and waste everyone's time, but we are where we are, and so would it be more efficient to accept their representation today that they're dismissing with prejudice or have us leave, have them go back and dismiss with prejudice, or litigate the case one or the other and then have us come back? I think it would be more efficient to accept their representation today, but, again, I don't need to take a firm position on that, and we're happy to trust in the Court's ability to govern its own jurisdiction. The complaint shows that Meeks walked into a restaurant, provided his phone number to the host, and then the host entered the number and sent him a text message. Meeks turned around and sued the restaurants for having sent... He got another text message, too, though, didn't he? He got two text messages. The cause of action here is based on just one of them at each restaurant. It's the first one that he received, and we know that the restaurants decided whether and when to send that text message because each one is linked to information within the restaurant's sole possession. In other words, counsel won't be able to explain how it was that Yelp knew that Mr. Meeks was in the restaurant or that his table was ready. Those facts alone prove irreversibly that the restaurants must have been the ones to have initiated the message. And what counsel is trying to do is confuse the matter by referring to the automated dialing system. But what paragraph 30 of the complaint says is that the restaurants sent the text. Now, if they used a platform to send the text, that's all well and good, but it doesn't change the fact that Yelp didn't send the text messages here. So what paragraphs 33 and 34 say is... Let me understand this as kind of an abstract matter. You're saying that if someone sets up a system that will produce an automatic action and somebody else does something else that uses the system that produces the automatic action, the person who set up the initial system is free of any responsibility for the action that took place? That's correct, Your Honor, so long as the platform is purely reactive. In other words, they're entering the number that triggers the platform to send the messages, what the restaurant intended to do. They're choosing the weather, the when. I said something in motion in the sense that I know the results can happen when Joel over there pulls the trigger and then shoots Susan, but I'm free of responsibility? That's correct. What you have to look at for that proposition is the e-mail petition that the FCC adjudicated in its 2015 order, and what that says is if the application is responding to something that the user has done or configured, it's purely reactive and is sending the message in accordance with what the restaurant has initiated. And both parties rely on the 2015 order here. It addresses the situation, as in this case, where there is an app user on the one hand and an app maker on the other hand. And in every one of those cases, you will have app users who send text messages. They're entering numbers. They're sending them to their contacts. And then you will also have an app maker, like Yelp in this case, who will send a text message because the app user has asked them to do that. That's every single case, Your Honor. So the situation that you're identifying is not different from every case. And in cases that we've identified, such as text me, e-mail, Lyft, Life360, WhisperText, all cases that were dismissed under Rule 12b-6, when the court was able to say the app user, and this is a person, there are individuals inside these restaurants, it's a hostess, as alleged in the complaint at paragraph 13 and 20 who's entering a number. Does that just reduce itself to the fact that you can sell a platform that gets third parties in trouble and you have no responsibility? Well, no, because there's no advertising here, and Mr. Meeks consented to receive these messages. Both of them? Yes, both of them. Both messages were about the reason for which he was in the restaurant. And if we want to turn to consent, I can do that. He consented to receive these messages by giving the number to the host, and the reason for being in the restaurant, which we can infer because he's there, he's asked for a table, he's put his name. So he consented to receive solicitations by virtue of the fact that he gave his phone number to be notified when there was a free table? Well, it depends on what you mean by solicitations. He didn't receive solicitations. Didn't he receive a link saying download the Yelp app? No, he did not. What did he get then? It's at paragraph 13 and paragraph 20 of the complaint. The text said, while you wait, only the restaurant could have known that he was there to be waiting. The text said, while you wait, download the Blazin' Rewards app. That's not the Yelp app. That's the Buffalo Wild Wings app, which is different. And it's important to have that point distinctly in mind. Now, paragraph 29 of the complaint says, Buffalo Wild Wings controls the content of these text messages. It says that very clearly. And, therefore, all of that content in the text message wasn't content that Yelp controlled. So even if they did control the content under the text me petition, they still wouldn't have liability because they didn't control whether, when, and to whom the text message was sent. But even if they did control the content of the text message, there was no advertising in it. Now, one thing the plaintiffs have said is that, well, there was a link, and if someone followed the link, they would have found other content. And I think that might have been the source of Your Honor's question. Other content, such as? Such as, well, if the user has the app installed, the link takes the user to the app, and they can check their place in line, just as described in the text message. If the user doesn't have the app installed, it goes to a Web page. And this is an important point. There can be no harm arising from advertising that the user doesn't see, and the user doesn't see anything if the user doesn't tap on the link. And what that establishes is that none of the content on these Web pages was transmitted by the restaurants or by Yelp. When you think about what the word call means under the TCPA, and it's Section 227B, what the TCPA penalizes is making calls. And that's when someone transmits a message to someone else. Included in that message is what you see in paragraphs 13 and 20. When a call recipient taps on a link, they're taking a separate independent action to request information over the Internet, which takes us outside of the TCPA altogether. So that if Yelp sent information in response to a link, it's not sending a text at all. It's sending information over the Internet in response to a request from a link. And I think that's a very important point for this Court to have in mind. It would be a substantial expansion of the TCPA if everything behind links qualified as part of a call that someone transmits using telephone lines. So everything that you see where a plaintiff asks you to consider what appeared on Yelp's Web pages, that's simply not part of this case altogether. And I do want to get clear with the Court the questions about who initiated these text messages. I think that's the heart of it. Because if someone's entering the telephone number, say it's your telephone in your house, you enter the telephone number, there is equipment that then initiates the call. That doesn't mean that the manufacturer of the telephone is the sender of the message. The person who's dialing the phone is still the sender. And this is the same except taking place in the context of applications. The restaurants know that when they enter the phone number into the app, the app that they are using will send the text message. That's exactly as intended. And it only makes sense because they're sending text messages to people who are in the restaurant and would benefit from checking their place in line. Or only the restaurant knows when the table is ready. But their argument is that there's essentially contributory involvement or vicarious liability on that point. Right. So we can talk about vicarious liability. There's no vicarious liability here for many of the same reasons, which is to say the restaurants controlled whether, when, and to whom, and what the text message says. Agency is nothing more than the right to control. But paragraph 29 of the complaint says, BWW exercises control over or has the right to control the advertisements sent to plaintiffs and other members of the putative class. That's a pretty clear allegation that they cannot contradict. And that establishes that Yelp did not have the right control, or, in other words, was not a principle controlling an agent. So there's no actual agency here. There's no apparent authority here either. And I would mention that plaintiffs didn't raise any of their other theories of vicarious liability in the district court. Not their apparent authority, not their ratification argument, not their joint venture argument. You won't see those arguments. They're brought here for the first time. There's no apparent authority because nothing in the text message represents that the restaurants are acting on behalf of Yelp. And so there's no basis for concluding that anyone could ever think that these restaurants were acting on behalf of Yelp. The text messages themselves say that Buffalo Wild Wings sent them. Because if you look at paragraphs 13 and 20 of the complaint, you'll see the message there quoted. It begins, BWW, and the information in the messages is about dining at the Buffalo Wild Wings restaurant. So no reasonable person would look at that text message and say, Aha, the restaurants have just sent me a message on behalf of Yelp. That doesn't make any sense. And so all of their theories fail in the vicarious liability space. Ratification doesn't make sense. There's no principal agent relationship for the reasons I mentioned. The restaurants didn't purport to be agents in their text messages. So with both of those two elements of ratification gone, there can be no ratification theory. They cannot allege that Yelp had actual knowledge that the restaurants were engaged in an illegal telemarketing scheme. For one thing, the only opinion currently on the books is the one from the Central District, which says that they failed to state a claim against the restaurants. But in any event, it would not be rational to think that the restaurants were engaged in an illegal telemarketing scheme. And what we're dealing with here is a person going into a restaurant, looking the hostess in the eye face-to-face, giving them a telephone number, and then getting one text message about checking their place in line and another when the table is ready. We're talking about two people who are in the same room. And so this situation is about as far from the ordinary mass telemarketing scheme that Congress had in mind when it enacted the TCPA as you could possibly get. People should be allowed to communicate in this way when they're in the same room and engaged in a perfectly ordinary and typical transaction that's beneficial for consumers and for businesses alike. And one thing that my colleague said about the ratification argument was, well, doesn't Yelp obtain some benefit from having people download its app? And that could be true. But what the FCC said in its 2015 order is it doesn't make any difference at all if the app maker obtains some benefit from having its app in circulation. If it did, the app provider would essentially always be liable, but we know from the result of the text me and e-mail petition that's not the case. And it was abundantly obvious in the text me petition in particular that text me wanted its app to be in circulation. That's how it made money. That didn't make any difference for the purposes of the FCC's determination in that case. Your Honor, so I'd like to leave you with the point that the plaintiffs already established all the facts that you could ever want to determine who sent the message here. The fact that there was some automated component somewhere down the line doesn't make any difference, just as you would say when you had an ordinary telephone that someone manufactured, the telephone manufacturer does not become the sender. Only the restaurants could have been the sender here because they had the information at issue. Mr. Meeks is someone who consented to receive this information, and he has no TCP claim that he can proceed against. He'd have to change the allegations of his complaint in order to do so. So we'd ask the Court to affirm the dismissal. Thank you. Thank you. Save some time. May I just ask you at the outset, I think you almost said this, but will you in fact proceed as if the dismissal of the non-Yelp defendants was with prejudice? We will. I'd like to touch briefly on the TCPA issues because there was a lot of that covered. Just responding to Yelp's points, first of all, this wasn't going to a Web page or the Internet. It was to download the Yelp app. Those links, these texts were sent. There was no way he could have checked his place in line unless he downloaded the Yelp app, provided Yelp his personal information, created a customer relationship with Yelp that allowed Yelp to harvest data and record information on him. It forced him to interact with the digital Yelp app platform. This was clearly advertising for Yelp. And with respect to it being advertising, this Court's opinion in Chesbrough makes clear that even if there's some informational content and, you know, there's clearly a commercial purpose, and those dual-purpose texts still constitute advertising under the TCPA. This was clearly commercial. It clearly promoted the Wild Wings defendants but also promoted Yelp. They received a benefit. As the Court in Herrick v. Shulis pointed out, by gathering more consumers onto the platform and helping them add businesses and add customers, it clearly benefits the app developer in that regard. And also with respect to consent, simply giving the teller the phone number didn't give him, it allowed the restaurants and Yelp to abuse the relationship under Van Patten. It didn't give consent for all purposes. Prior express written consent was required here, and that was not received. So simply by giving his telephone number didn't allow them to spam text him for any purpose. And this is exactly within the ambit of the cases that the TCPA sought to prevent this type of abuse. This is very also different than the — I'm out of time. No, finish your sentence. This is very different than the consumer-facing situation in the text me and Yelp and e-mail petitions that the FCC considered as well as in the district court cases following it. This is a business-to-business marketing campaign. This isn't an individual consumer who's using an app to interact with their friends. This is a business marketing campaign, and the two cases dealing with that both found indicator liability. And is there anything in the FCC declaratory order that suggests that it would be different if it was a business-to-business platform versus a consumer-directed platform? The FCC didn't address that situation. It only was addressing petitions in the consumer context. So, no, there isn't anything on point. But we think under the totality of the circumstances and discernible involvement standards from the 2015 order, this certainly meets that criteria in this situation. One quick question. I assume that your representation that you dismiss the other defendants, Buffalo Wings, with prejudice, is contingent upon this court assuming jurisdiction. It's not meant to have some collateral effect in some other case that might be filed down the road. I guess what I'm saying is the context is to, I'm just concerned about the sort of scope of that representation where you come to court and you say, yes, we will now agree that that dismissal without prejudice is now with prejudice. And I'm trying to understand what implications that might have down the road if this court were to rule that, indeed, there was no jurisdiction. Maybe I can't think of any at the time, but you've essentially sort of crossed a bridge, but I think it's subject to the court assuming that that provides a basis for jurisdiction. I guess I was a little bit unclear. I thought we were just saying that we weren't saying we're going back and amending the dismissal to be with prejudice. We have just, in effect, abandoned the claims as if it had been with prejudice. We just don't intend to pursue them, and Mr. Meeks doesn't intend to pursue them against these entities. I'm not sure of what effects there would be, since we don't have any intent to revive this litigation as to them in a broader circumstance. Still just expressing your intention rather than emphatically saying we would consent to a dismissal with prejudice. Right, right. We are not going to. Mr. Meeks is not going to sue them again in this action or another action. That's not what we're going to do if it's reversed. Or even if it, you know, no matter what happens, we're not going to do that. Okay. Well, maybe I was overthinking the issue. Okay. Thank you. Perhaps I'm confused. Thank you. Okay. Thank both sides for their arguments. Meeks v. Yelp et al. Submitted for decision.
judges: W. Fletcher, Miller, Pregerson